UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| **JERRY A. FERGUSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Case No. 04-CV-2087 |
| ) | |
| **PETE WALKER, THOMAS SALISKI,** ) | |
| **WALLACE MILBURN, ALLEN THOMAS,** ) | |
| **DALLIS HUDDLESTON, JAMES** ) | |
| **PALUMBO, CAROL CHENOWETH, and** ) | |
| **the VILLAGE OF LUDLOW, a municipal** ) | |
| **corporation of Champaign County, Illinois** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#29) filed by Defendants, Pete Walker, Thomas Saliski, Wallace Milburn, Allen Thomas, Dallis Huddleston, James Palumbo, Carol Chenoweth, and the Village of Ludlow. Following this court's careful consideration of the arguments of the parties and the documents provided by Defendants, Defendants' Motion for Summary Judgment (#29) is GRANTED.

FACTS

In June 1997, Plaintiff was hired as a part-time police officer by the Village of Ludlow. At that time, there were no full-time police officers employed by the Village. In August 1997, Plaintiff was given a raise to $8.50 per hour and was promoted to the position of Chief of Police. The Village also hired a part-time police officer, Mark Galindo, at $7.50 per hour. In September 1997, Plaintiff was given another raise to $10.00 per hour. Plaintiff and Galindo each worked about 20 hours per week.

In June 1998, the Village received a grant through the Office of Community Policing

Services (COPS) Uniform Hiring Program (UHP). The grant award date was March 1, 1998, and the end date was February 28, 2001. The grant awarded the Village funds to contribute to the costs of salary and benefits for one full-time police officer and two part-time police officers with the federal share decreasing year to year and the Village's share increasing year to year.

In July 1998, after the grant was in effect, Plaintiff's Chief of Police position became a full-time position. The position was COPS funded and his wage was $16.20 per hour. The Village also had two part-time police officers who were paid $11.50 per hour. Plaintiff worked the day shift Monday through Friday. In March 1999, Plaintiff's pay was raised to $17.01 per hour and the wage for the two COPS funded part-time positions was raised to $12.08 per hour. Jason Thorn was hired as a full-time police officer on April 5, 1999, at a wage of $8.00 per hour.

On February 28, 2001, the COPS UHP grant ended. Thereafter, Plaintiff was paid by the Village. Plaintiff also received full benefits which were paid for by the Village. In September 2001, the Village was awarded a COPS in Schools grant for funding the salary and benefits of a School Resource Officer (SRO). Jason Thorn was transferred to the SRO position. The Village was responsible for a share of the cost of this officer and the Village's share increased each year. On October 1, 2001, the Village hired another full-time police officer, Greg Willard, at an hourly rate of $9.00 per hour.

On January 13, 2002, Plaintiff enlisted in the United States Coast Guard Reserves. On January 27, 2003, Plaintiff was called to active duty. While on active duty, Plaintiff received military benefits including health, dental, and life insurance. These benefits included family coverage.

In April 2003, Defendant Pete Walker was elected Mayor of the Village. He took office in

May 2003. At that time, the remaining individual Defendants were members of the Board of Trustees of the Village. As of May 2003, Plaintiff was paid $19.31 per hour for his position as Chief of Police. Jason Thorn was paid $15.75 per hour and Greg Willard was paid $11.00 per hour. Plaintiff, Thorn, and Willard were all full-time employees and all received benefits from the Village. Walker served on the Village Board of Trustees prior to his election to the position of Mayor. During his tenure on the Board, Walker was aware of the Village's dwindling revenues and the need to reduce the Village's budget. He was concerned about how the Village could spend as much money as it did on police while generating a limited amount of revenue. After entering office, Walker discussed with the Village Board the Village's budget constraints and the police department.

Plaintiff testified that, prior to Walker's election as Mayor, Walker told him "[b]asically that if he was elected mayor, that I wouldn't have a job." Plaintiff testified that he told Walker "that the police department, you know, showed proof, you know, of the need in town, and [Walker] said that he didn't think it was necessary for a police department to be there." Plaintiff testified that he believed Walker had a "personal vendetta" against him. He stated that, sometime between 1997 and 1999, he arrested Walker's brother for a curfew violation and Walker's brother was sent back to prison.

On June 30, 2003, Plaintiff returned from active duty and was restored to his former position as Chief of Police. He received that same pay and benefits that he received prior to entering active duty. On August 6, 2003, an independent audit of the Village's financial statements for the fiscal year ending March 31, 2003, was completed and an Auditor's Report was issued. The Auditor's Report showed that, for the fiscal year ending March 31, 2003, the Village had total revenues of $162,932.00 (which included the COPS grant for the SRO officer) and total expenditures of

$186,527.00, resulting in a deficit of $22,595.00. During that fiscal year, the Village expended $127,142.00 for its police department. The COPS grant for the School Resource Officer contributed $52,629.00 to Jason Thorn's salary and benefits; however, the Village expended $74,513.00 of its own funds to pay for its police department. Subsequently, Greg Willard resigned from the police department, effective August 11, 2003, to take a position in Joliet.

On September 22, 2003, Plaintiff began a course in Advanced Law Enforcement Management at the Federal Bureau of Investigation (FBI) in Quantico, Virginia. Walker testified that, prior to the time Plaintiff left for Quantico, he may have told Plaintiff that the Village was going broke and "[w]e are going to have to do something, realign the police department on the hours when he got back." Plaintiff testified that Walker told him "to expect changes" when he returned. By October 2003, Jason Thorn was applying for other employment. To cut the budget, Walker decided to ask Plaintiff to accept a pay cut, or, alternatively, ask if he would accept the SRO position.

On October 30, 2003, Walker called Plaintiff in Quantico to discuss the situation. According to Plaintiff, Walker told him the Village was eliminating the Chief of Police position and that Walker was willing to offer him the SRO position. Plaintiff testified that he advised Walker that would not work, because prior authorization from the school was necessary. Plaintiff testified that he asked Walker why the Village was doing this and Walker said it was budgetary reasons. According to Walker, he told Plaintiff that the Village had budgetary problems and the first thing out of Plaintiff's mouth was that "he wasn't taking a pay cut." Walker testified that he offered Plaintiff the SRO position. He testified that Plaintiff was qualified for this position according to the information Walker had received from "the people with the federal money." Walker testified that,

4

because Plaintiff would not accept the SRO position or a pay cut, he told Plaintiff he would not have a position when he returned from Quantico on December 5, 2003. Walker testified that he informed Plaintiff that the Village would keep him on all of his benefits until December 5, 2003. Plaintiff received vacation pay for the time he spent in Quantico.

The evidence shows that Walker made the decision to terminate Plaintiff's employment. As Mayor, Walker could discharge Plaintiff without Board approval, but two-thirds of the Board could overrule his decision. On November 3, 2003, at a Village Board meeting, Walker announced that he discharged Plaintiff. Prior to the meeting, Walker had discussed the termination of Plaintiff's employment with four Board members, one on one, and had determined that the four Board members concurred with his decision. At the meeting, the Board did not overturn his decision with a two-thirds vote.

On November 10, 2003, Walker sent Plaintiff a letter following up on their conversation on October 30, 2003. In the letter, Walker reiterated to Plaintiff that he had to cut the Village's police force because of budgetary concerns, asked Plaintiff for his resignation because Plaintiff had indicated his unwillingness to take a pay cut or make a lateral move, and advised Plaintiff that his employment with the Village would end on December 5, 2003.

Jay Thorn resigned his position with the Village, effective November 30, 2003, to take a position in the Sheriff's Department as a deputy. After Thorn and Plaintiff left, the Village employed two part-time police officers. Currently, the Village has no full-time employees and employs only two part-time police officers and two part-time water maintainers. No Village employees receive benefits. Greg Worrell is currently the part-time Chief of Police. He works 15 hours per week and earns $13.00 per hour. Worrell receives no benefits from the Village. The other

part-time police officer, Dave Phillips, works 16 hours per week and earns $11.00 per hour. The Village is advertising for another part-time police officer. The Village has not had a full-time employee with benefits since Plaintiff's position ended on December 5, 2003.

On May 5, 2004, Plaintiff filed a 27-count Complaint (#1) against Defendants. On September 2, 2004, Plaintiff filed his First Amended Complaint (#11). In Counts One through Eight, against each individual Defendant and the Village, respectively, Plaintiff alleged that each Defendant violated Plaintiff's rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301 et seq. Plaintiff alleged that he was denied benefits in violation of USERRA and also alleged that his termination violated USERRA. In Counts Nine through Fifteen, against the individual Defendants, respectively, Plaintiff asserted claims under 42 U.S.C. § 1983, alleging that he was deprived of his property and liberty rights under the Fifth and Fourteenth Amendments. In Count Sixteen, against the Village, Plaintiff asserted a claim under § 1983 and alleged that the Village, through its policies and practices, deprived Plaintiff of his property interest in his job without due process of law in violation of his Fifth and Fourteenth Amendment rights. In Count Seventeen, against all Defendants, Plaintiff asserted a claim under § 1983 and alleged that Defendants conspired to deprive Plaintiff of his employment in violation of the Fifth and Fourteenth Amendments. In Counts Eighteen through Twenty-Four, against the individual Defendants, respectively, Plaintiff alleged that each Defendant violated the Illinois Service Men's Employment Tenure Act (SMETA), 330 Ill. Comp. Stat. 60/1 et seq. (West 2002). In Count Twenty-Five, against the individual Defendants, Plaintiff alleged that Defendant wrongfully discharged Plaintiff. In Count Twenty-Six, against the Village, Plaintiff alleged a cause of action on the theory of "wrongful discharge in tort." In Count Twenty-Seven, against the Village,

Plaintiff alleged a cause of action on the theory of "wrongful discharge breach of contract."

On December 14, 2004, this court entered an Order (#17) and accepted the Magistrate Judge's Report and Recommendation (#15). This court dismissed Counts Twenty-Five through Twenty-Seven of Plaintiff's Amended Complaint and also dismissed the prayers for future economic loss and noneconomic damages in Counts One through Eight and Eighteen through Twenty-Four.

On September 6, 2005, Defendants filed a Motion for Summary Judgment (#29) and a Memorandum in Support (#30) with supporting Exhibits. On October 11, 2005, Plaintiff filed his Memorandum in Opposition to Summary Judgment (#34). On October 25, 2005, Defendants filed their Reply Memorandum of Law (#35).

## ANALYSIS

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000), quoting Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999). In making this determination, the court

must consider the evidence in the light most favorable to the party opposing summary judgment. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970); <u>Adams v. Wal-Mart Stores, Inc.</u>, 324 F.3d 935, 938 (7th Cir. 2003). However, neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. <u>Michas</u>, 209 F.3d at 692. Moreover, a plaintiff cannot defeat summary judgment by raising immaterial issues of fact. See <u>Jordan v. Summers</u>, 205 F.3d 337, 345 (7th Cir. 2000).

## II. PLAINTIFF'S CLAIMS

In their Motion for Summary Judgment, Defendants argue that they are entitled to judgment as a matter of law on all of Plaintiff's claims. In Plaintiff's Response, Plaintiff conceded that the evidence adduced during discovery was not sufficient to support claims against the individual Board members for violations of USERRA and SMETA. Accordingly, based upon Plaintiff's concession, Defendants are entitled to summary judgment on Counts Two through Seven and Nineteen through Twenty-Four of Plaintiff's Amended Complaint.

In addition, as pointed out in Defendants' Reply, Plaintiff did not respond to Defendants' arguments with respect to Plaintiff's claims that Defendants violated USERRA and SMETA by failing to provide him with various benefits during the time he was on active duty and employed by the Village, and violated SMETA by failing to pay him the difference between his military pay and civilian pay. Moreover, the undisputed facts establish that Plaintiff cannot prevail on these claims. This court therefore agrees with Defendants that they are entitled to summary judgment on Plaintiff's claims regarding benefits and pay while he was on active duty.

Defendants also point out that Plaintiff did not respond to their argument that Plaintiff's

constitutional claims are precluded by USERRA and that Plaintiff has apparently abandoned any substantive due process claims for deprivation of his liberty interest as well as any procedural due process claims he may have asserted in his Amended Complaint. Defendants further point out that Plaintiff did not respond to their argument that Plaintiff cannot demonstrate that Walker conspired with the other Defendants to deprive him of his property interest in his job.

In his Memorandum in Opposition to Summary Judgment, Plaintiff argued, regarding his § 1983 claims, that Plaintiff had a constitutionally protected property interest in his position as Chief of Police which flowed from the protections guaranteed by USERRA and SMETA. Plaintiff did not make any argument in support of his other allegations based upon § 1983 and this court therefore agrees with Defendants that Plaintiff has abandoned his remaining § 1983 claims. As far as his property interest claim, Plaintiff has cited no authority in support of his theory that protections guaranteed by USERRA and SMETA can form a "legitimate claim of entitlement" which is the basis for a constitutionally protected property interest. In fact, this court agrees with Defendants that the law is to the contrary. In <u>Satterfield v. Borough of Schuykill Haven</u>, 12 F. Supp. 2d 423 (E.D. Pa. 1998), the plaintiff brought an action under USERRA challenging his termination from his manager position and also brought various constitutional claims challenging the termination. The district court in <u>Satterfield</u> determined that the plaintiff did not have a legitimate claim of entitlement to his job as manager under state law. <u>Satterfield</u>, 12 F. Supp. 2d at 433. The court in <u>Satterfield</u> also stated:

> A separate claim advanced by the Plaintiff alleges that public officials violated a federal statute by discriminating against him on the basis of his military status. This statute provides its own

9

>
> comprehensive enforcement mechanism. The Plaintiff may not now bypass that mechanism by alleging a constitutional violation and bringing suit directly under § 1983.

Satterfield, 12 F. Supp. 2d at 437, citing Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 20 (1981) (when "a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983") and Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 789 (3d Cir. 1990) (plaintiff's constitutional claims were subsumed by Title IX); see also Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 378 (1979) (civil rights statute may not be invoked to redress a violation of Title VII). The court in Satterfield therefore concluded that the plaintiff's constitutional claims were subsumed by USERRA. Satterfield, 12 F. Supp. 2d at 438. The district court in Satterfield noted that this conclusion did not prejudice the plaintiff's case as he had stated a separate cause of action under USERRA. Satterfield, 12 F. Supp. 2d at 438. This court agrees with the reasoning of the district court in Satterfield and also concludes that Plaintiff's § 1983 claims are subsumed by USERRA.

This court further concludes that Plaintiff's reliance on SMETA as the source of his property interest in his employment fares no better. "In enacting USERRA, Congress intended a uniform set of protections available to returning veterans in the several states and expressly forbade modification of these protections by either state law, benefit plans or contractual bargaining because it would frustrate the statutory purpose." Wriggelsworth v. Brumbaugh, 129 F. Supp. 2d 1106, 1112 (W.D. Mich. 2001) (emphasis in original). Because preemption of state law is intended in precisely those kinds of circumstances, state law is preempted by USERRA. Wriggelsworth, 129 F. Supp. 2d at

1112; see also Jennings v. Ill. Office of Educ., 589 F.2d 935, 944 (7th Cir. 1979) (Veterans' Reemployment Rights Act (previous Act protecting veterans' rights) preempted SMETA in view of "Congress' explicit design for uniform enforcement among the States"). Based upon this authority, this court concludes that USERRA provides Plaintiff's only basis for recovery so that Plaintiff cannot rely on SMETA as the basis of a property interest in his employment. This court therefore concludes that Defendants are entitled to summary judgment on all of Plaintiff's § 1983 claims, Counts Nine through Seventeen. This court further concludes that summary judgment is proper as well on Plaintiff's remaining SMETA claim against Walker, Count Eighteen.[1]

The only claims remaining, therefore, are Plaintiff's USERRA claims against Walker and the Village regarding the termination of his employment, which are included in Counts One and Eight of Plaintiff's Amended Complaint. The issue before this court is whether Walker and the Village had "cause" to discharge Plaintiff.

"USERRA prohibits discrimination by, among other things, denying any benefit of employment on the basis of the employee's membership in the uniformed services." Miller v. City of Indianapolis, 281 F.3d 648, 650 (7th Cir. 2002). USERRA, enacted in 1994, is the most recent in a series of laws protecting veterans' employment and reemployment rights dating from the Selective Training and Service Act of 1940. Rogers v. City of San Antonio, 392 F.3d 758, 762 (5th Cir. 2004), cert. denied, 125 S. Ct. 2945 (2005). USERRA's immediate precursor was the Veterans' Reemployment Rights Act (VRRA). Rogers, 392 F.3d at 762. Congress, in enacting USERRA,

---

[1] This court recognizes that Defendants did not specifically make this argument regarding the SMETA claim against Walker. However, this court's conclusion that the SMETA claim is preempted by Plaintiff's USERRA claim does not prejudice Plaintiff as Plaintiff has argued that, based upon USERRA and SMETA, he could not be discharged for one year without cause. Based upon Plaintiff's argument, it is clear that he is not arguing that SMETA provided him any protections not provided by USERRA.

11

emphasized: (1) USERRA's continuity with the VRRA and its intention to clarify and strengthen that law; (2) Federal laws protecting veterans' employment and reemployment rights for the past fifty years had been successful; and (3) the "large body of case law that had developed under those statutes remained in full force and effect, to the extent it is consistent with USERRA." Rogers, 392 F.3d at 762. Accordingly, the legislative history of USERRA indicates that prior veterans' reemployment rights statutes and case law should be utilized in interpreting its provisions. Duarte v. Agilent Techs., Inc., 366 F. Supp. 2d 1039, 1046 (D. Colo. 2005), citing H.R. Rep. No. 103-65, at 19 (1993), reprinted in 1994 U.S.C.C.A.N. 2449, 2452. Section 4316(c)(1) of USERRA provides:

> **(c)** A person who is reemployed by an employer under this chapter shall not be discharged from such employment, except for cause–
>
> **(1)** within one year after the date of such reemployment, if the person's period of service before the reemployment was more than 180 days.

38 U.S.C. § 4316(c)(1). "Cause" as used in § 4316(c) is not defined by USERRA. Duarte, 366 F. Supp. 2d at 1046. Defendants bear the burden of proving that Plaintiff was terminated for "cause." Duarte, 366 F. Supp. 2d at 1046.

In Keserich v. Carnegie-Illinois Steel Corp., 163 F.2d 889, 890 (7th Cir. 1947), the Seventh Circuit held that "cause" in this type of situation meant "such [cause] as a fair-minded person may act upon" and "not a mere excuse or an arbitrary action to avoid the provisions of the statute." See also Michell v. Cont'l Loss Adjusting Servs., 1994 WL 761962, at *6 (S.D. Ala. 1994), aff'd, 55 F.3d

638 (11th Cir. 1995). In Foor v. Torrington Co., 170 F.2d 487 (7th Cir. 1948), the Seventh Circuit again discussed the issue of "cause" under the Selective Training and Service Act of 1940. The court stated the test is "whether or not the discharge by the employer was a reasonable one under the circumstances." Foor, 170 F.2d at 490; see also Koons v. Lebanon Steel Foundry, 92 F. Supp. 914, 916 (M.D. Pa. 1950). The Seventh Circuit recognized that "[c]ause for discharge within the meaning of the Act may arise from severe adverse economic conditions, which necessitate a retrenchment and the dissolution in good faith of existing jobs." Foor, 170 F.2d at 490. Other courts have also recognized that economic conditions mandating a reduction in the number of employees may constitute cause for discharge under USERRA and its predecessor statutes. See Ruesterholtz v. Titeflex, Inc., 166 F.2d 335, 336-37 (3d Cir. 1948); Duarte, 366 F. Supp. 2d at 1046; Michell, 1994 WL 761962, at *7; Palma v. Republic Steel Enters., Inc., 1975 WL 1058, at *3 (N.D. Ohio 1975); Maloney v. Chicago B. & Q. R. Co., 72 F. Supp. 124, 125-26 (W. D. Mo. 1947).

In this case, Defendants argue that the undisputed facts establish that Plaintiff was discharged because of the Village's budgetary constraints. Defendants note that the facts show that, in the six years prior to Walker taking office as Mayor of the Village, two prior administrations had tripled the Village's police protection and doubled the hourly wage for its police officers. They argue that, prior to Walker entering office, he had been aware of the Village's dwindling revenues and the need to reduce the Village's budget. Walker had been concerned with how the Village could afford to spend as much money as it did on police while generating a limited amount of revenue. Defendants further note that the evidence showed that the Village had a deficit of $22,595.00 for the fiscal year ending March 31, 2003. In October 2003, in order to cut the budget, Walker decided to ask Plaintiff to accept a pay cut, or, alternatively, ask if he would accept the SRO position. Defendants argue that,

when Plaintiff refused to agree to either of these options during his telephone conversation with Walker on October 30, 2003, Walker advised Plaintiff that his employment with the Village would end on December 5, 2003. Defendants further argue that the undisputed facts show that Plaintiff was the Village's last full-time employee. Since Plaintiff's discharge, the Village has employed only part-time police officers with no benefits. Defendants argue that "the Village has gone full circle back to the level of police protection it had prior to Plaintiff's employment and prior to the federal grants."

In response, Plaintiff argues that a genuine issue of material fact exists regarding whether the Village's budgetary problem was the real reason for his discharge. Plaintiff argues that an examination of the audit shows that the Village's budgetary problems did not justify his termination. He argues that, when a $20,751 capital outlay for vehicles and other equipment and the grant money received are deducted from the police department expenditures, the audit shows that the Village's expenditures for police personnel was only $53,762.00. Plaintiff also argues that, in October 2003, there was no need to terminate his employment for budgetary reasons because Willard had already resigned and Walker knew that Thorn was applying for other employment. Plaintiff contends that the real reason for his termination was Plaintiff's arrest of Walker's brother which led to his return to prison.[2] Plaintiff contends that reasonable jurors could conclude that there was no just cause for the termination of his employment.

In their Reply, Defendants argue that the material undisputed facts establish that when Walker entered office he was faced with a budget deficit and decided to cut the payroll of the Village's largest expenditure, its police department. Defendants contend that this was also the Village's most

---

[2] Plaintiff also recounts some problems he had with two Board members. However, this court agrees with Defendants that these facts are immaterial as there is no evidence that either of these Board members was involved in the decision to terminate Plaintiff's employment.

expendable expenditure as the Village's police department had tripled in six years. Defendants argue that it is clear, based upon the undisputed facts, that Plaintiff was discharged for budgetary reasons.

This court concludes that the undisputed facts presented in this case show that the Village was facing a deficit in its budget and that the expenses for the Village's police department had grown significantly in the years prior to Walker being elected as Mayor. The undisputed evidence also shows that, following the termination of Plaintiff's employment, the Village has only employed part-time police officers and has thereby significantly reduced the cost of the police department. In response to these facts, Plaintiff has argued that the real reason he was discharged was because of Walker's "personal vendetta" against him. However, this court concludes that this argument is based upon pure speculation on the part of Plaintiff with no evidence to support it. It appears that Plaintiff is just assuming that Walker had it in for him because he arrested Walker's brother some time between 1997 and 1999. The only evidence Plaintiff has presented as support for this speculative assumption is the conversation Plaintiff testified that he had with Walker before Walker was elected Mayor. Plaintiff testified that Walker told him he would not have a job if Walker was elected Mayor and that Walker "didn't think it was necessary for a police department to be there." This court concludes that this statement by Walker is consistent with Defendants' position that Walker believed the Village was spending too much for its police department and provides no support for Plaintiff's position that Walker wanted to get rid of Plaintiff because he had a "personal vendetta" against him. Indeed, the undisputed facts show that Walker offered Plaintiff the opportunity to take the SRO position and remain employed with the Village.

Following this court's careful review of all of the evidence presented in this case, this court concludes that the undisputed facts establish that Walker's decision to terminate Plaintiff's

employment because of budgetary concerns was "a reasonable one under the circumstances." See Foor, 170 F.2d at 490. Accordingly, this court agrees with Defendants that they are entitled to summary judgment on Plaintiff's USERRA claims, Counts One and Eight.

IT IS THEREFORE ORDERED THAT:

(1) Defendants' Motion for Summary Judgment (#29) is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff.

(2) This case is terminated. Accordingly, the final pretrial conference scheduled on December 22, 2005, and the jury trial scheduled on January 9, 2006, are hereby VACATED.

ENTERED this 10th day of November, 2005.

s/MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE